## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Sharon Peterson,                                  Civil File No.  0:15-cv-4041 (ADM/SER)

            Plaintiff,

v.

Metropolitan Council,

            Defendant.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT METROPOLITAN COUNCIL'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

507011

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ 1

I.      INTRODUCTION ................................................................................... 1

II.     STATEMENT OF UNDISPUTED FACTS ............................................ 2

        A.    Metro Transit's Operating Structure. ............................................ 2

        B.    Peterson's Employment With Metro Transit. ................................. 4

        C.    Peterson's November 2014 Complaint. ......................................... 9

        D.    Peterson's Removal From Relief Dispatch. ................................... 9

III.    ARGUMENT ........................................................................................ 11

        A.    Peterson's Discrimination Claims Fail. ....................................... 12

              1.    Even assuming Peterson can establish a prima facie case for
                    failure to promote, the Council has articulated a legitimate
                    nondiscriminatory reason for its hiring decision. ............................. 13

              2.    Peterson cannot show the Council's decision was pretext for
                    race discrimination. .......................................................................... 15

              3.    Peterson's Section 1981 and 1983 failure to promote claims
                    fail as a matter of law. ...................................................................... 17

        B.    Peterson's Retaliation Claim Under The MHRA Fails. ............... 19

              1.    Peterson's alleged retaliatory treatment does not rise to
                    actionable adverse employment action. ............................................ 20

              2.    Metro Transit had a legitimate nondiscriminatory reason to
                    remove Peterson from her relief dispatch position ........................... 22

              3.    Peterson cannot show her removal from relief dispatch was
                    pretext for retaliation based on her EEOC charge. .......................... 24

        C.    Peterson's FMLA Interference And Retaliation Claims Fail. ...... 26

              1.    Peterson's FMLA interference claim fails because she neither
                    requested leave nor provided sufficient notice of her need for
                    leave. .................................................................................................. 27

2.      Peterson's FMLA Retaliation Claim Fails........................................ 30

D.      Peterson's Interference And Retaliation Claims Under State Law Similarly Fail............................................................................................. 31

**IV.    CONCLUSION ..........................................................................................31**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen v. Rumsfeld*,
  72 Fed. Appx. 497 (8th Cir. 2003) ............................................................ 14

*Arradondo v. City of Minneapolis*,
  No. CIV. 13-2488 RHK, 2015 WL 4727202 (D. Minn. Aug. 10, 2015) ................... 12

*Arraleh v. Cty. of Ramsey*,
  461 F.3d 967 (8th Cir. 2006) .................................................... 15, 22, 23, 25

*Artis v. Francis Howell N. Band Booster Ass'n, Inc.*,
  161 F.3d 1178 (8th Cir. 1998) ......................................................... 12

*Aubuchon v. Knauf Fiberglass, GmbH*,
  359 F.3d 950 (7th Cir. 2004) ........................................................ 29

*Black v. Indep. Sch. Dist. No. 316*,
  476 F. Supp. 2d 1115 (D. Minn. 2007) .......................................... 19, 20, 22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .............................................................. 11, 12

*Chappell v. Bilco Co.*,
  675 F.3d 1110 (8th Cir. 2012) ..................................................... 27, 30

*Chivers v. Wal-Mart Stores, Inc.*,
  641 F.3d 927 (8th Cir. 2011) .............................................. 20, 23, 25, 26

*Cruz v. Publix Super Markets, Inc.*,
  428 F.3d 1379 (11th Cir. 2005) ...................................................... 29

*Devin v. Schwan's Home Serv., Inc.*,
  491 F.3d 778 (8th Cir. 2007) ........................................................ 20

*E.E.O.C. v. Con-Way Freight, Inc.*,
  622 F.3d 933 (8th Cir. 2010) ..................................................... 13, 18

*Egerdahl v. Hibbing Cmty. Coll.*,
  72 F.3d 615 (8th Cir. 1995) ......................................................... 12

*Haas v. Kelly Servs., Inc.*,
  409 F.3d 1030 (8th Cir. 2005) ....................................................... 25

*Hager v. Arkansas Dep't of Health*,
   735 F.3d 1009 (8th Cir. 2013) .................................................................. 30

*Hervey v. Cty. of Koochiching*,
   527 F.3d 711 (8th Cir. 2008) .................................................................... 22

*Humphries v. Pulaski Cty. Special Sch. Dist.*,
   580 F.3d 688 (8th Cir. 2009) .................................................................... 13

*Jenkins v. Winter*,
   540 F.3d 742 (8th Cir. 2008) .................................................................... 16

*Kincaid v. City of Omaha*,
   378 F.3d 799 (8th Cir. 2004) .................................................................... 15

*Logan v. Liberty Healthcare Corp.*,
   416 F.3d 877 (8th Cir. 2005) .................................................................... 25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................. 12

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ............................................................................. 12, 30

*Pearson v. Indep. Sch. Dist. No. 2142*,
   No. 00-779 PAM/JGL, 2001 WL 1640071 (D. Minn. Aug. 22, 2001) ................ 16, 18

*Phillips v. Matthews*,
   547 F.3d 905 (8th Cir. 2008) .................................................................... 30

*Pierce v. Marsh*,
   859 F.2d 601 (8th Cir. 1988) .................................................................... 14

*Richey v. City of Independence*,
   540 F.3d 779 (8th Cir. 2008) ............................................................... 23, 25

*Rynders v. Williams*,
   650 F.3d 1188 (8th Cir. 2011) ............................................................. 27, 28

*Scobey v. Nucor Steel-Arkansas*,
   580 F.3d 781 (8th Cir. 2009) .................................................................... 27

*Skaff v. Fairview Health Servs.*,
   No. CIV. 12-312 ADM/SER, 2012 WL 1466775
   (D. Minn. Apr. 27, 2012) ........................................................................... 31

*Sprenger v. Fed. Home Loan Bank of Des Moines*,
   253 F.3d 1106 (8th Cir. 2001) ................................................................... 30

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993) ................................................................................... 12

*Torgerson v. City of Rochester*,
   643 F.3d 1031 (8th Cir. 2011) ............................................................ *passim*

*Wierman v. Casey's General Stores*,
   638 F.3d 984 (8th Cir. 2011) ..................................................................... 30

*Woodson v. Int'l Bhd. of Elec. Workers*,
   974 F. Supp. 1256 (D. Minn. 1997) ................................................. 1, 12, 13

RULES

Fed. R. Civ. P. 56(a) ....................................................................................... 11

STATUTES

29 U.S.C. § 2615(a)(1) .................................................................................... 27

42 U.S.C. §§ 1981 and 1983 .................................................................... *passim*

42 U.S.C. § 2000e-5(e)(1) ............................................................................... 13

Minn. Stat. § 181.943 ........................................................................................ 1

Minn. Stat. § 181.9413 ................................................................................ 1, 31

Minn. Stat. § 363A.28 ..................................................................................... 13

OTHER AUTHORITIES

29 C.F.R. § 825.302(a) .................................................................................... 27

## I.   INTRODUCTION

Defendant Metropolitan Council moves for summary judgment and dismissal of Plaintiff Sharon Peterson's Amended Complaint.   Peterson, a current District Street Supervisor and long-time bus operator and relief dispatcher for Metro Transit,[1] has alleged claims of race discrimination under the Minnesota Human Rights Act ("MHRA"), Title VII, and 42 U.S.C. §§ 1981 and 1983; reprisal under the MHRA and Minnesota Statutes section 181.9413; interference and retaliation under the Family and Medical Leave Act ("FMLA"); and interference with sick leave under Minnesota Statutes section 181.9413.[2]   Summary judgment is appropriate on all claims.

Peterson's race discrimination claims are based on her failure to receive promotions to the District Street Supervisor position prior to August 2016 when she was selected for the position.[3]   But the evidence is undisputed that in her prior attempts at the promotion she did not score high enough – *in a blind application scoring process* – to

---

[1] Metro Transit is an operating division of Defendant Metropolitan Council.   Defendant shall be referred to as "Metro Transit" or "the Council."

[2] In her Amended Complaint, Peterson alleges a violation of her sick leave rights under Minn. Stat. § 181.943.   The Council presumes Peterson is asserting a claim under Minn. Stat. § 181.9413.

[3] In 2010, Peterson received a promotion to Transit Control Center Supervisor.   Four months into that position, Peterson abandoned her shift, resigned from her supervisory position, and returned to driving a bus.   In August 2016 she received a promotion to District Street Supervisor.   Peterson's Amended Complaint, therefore, focuses on promotions that she did not receive between her promotion in 2010 and her promotion in 2016.   Only one promotion – to District Street Supervisor in April 2014 – is within the 300 day statute of limitations under Title VII and the one-year statute of limitations under the MHRA; additional promotions fall within the six year statute of limitations for purposes of Peterson's Section 1981 and 1983 claims.   *See Woodson v. Int'l Bhd. of Elec. Workers Local 292*, 974 F. Supp. 1256, 1259-62 (D. Minn. 1997).

move forward in the hiring process.   Peterson also alleges reprisal/retaliation both for filing a charge with the Equal Employment Opportunity Commission ("EEOC") over the denied promotions and for requesting leave under the FMLA and Minnesota's sick leave statute.   She claims she was removed from her relief dispatcher position and "subjected to harassment" for this protected conduct.    However, the evidence is undisputed that Peterson was removed from her relief dispatch position consistent with Metro Transit policy after she refused three times to work an open dispatch shift.   The Council thus had a legitimate reason for this action which Peterson cannot show was retaliatory.   Further, Peterson's allegations that she was excessively monitored and "targeted" are not supported by the record and, even considered in the light most favorable to Peterson, do not rise to an adverse employment action.   Finally, the evidence is undisputed that Peterson never requested FMLA or sick leave, defeating those claims as a matter of law. Because Peterson cannot establish the elements of any of her claims, the Amended Complaint should be dismissed in its entirety with prejudice.

## II.      STATEMENT OF UNDISPUTED FACTS

### A.    Metro Transit's Operating Structure.

Metro Transit is the public transportation provider for the seven-county metropolitan area, offering bus, light rail, and commuter rail services.   Bus operators are assigned to one of five garages, each of which services a specific portion of the metropolitan area.   Each garage has its own Garage Manager who oversees the operation of the garage.   The Garage Manager is assisted by Assistant Transportation Managers ("ATMs"), who supervise a specific group of bus operators.   ATMs interact with bus

operators daily and address operation and employment issues, including requests for leave.

Metro Transit is also staffed with dispatchers and relief dispatchers who work at Metro Transit's five garages and assist with the day-to-day transit operation. Dispatchers are tasked with "dispatching" work—i.e., assigning bus operators to buses and bus routes; monitoring bus operator absences to identify shifts that must be filled; assigning unstaffed or "open" bus routes to on-call bus operators; distributing overtime to bus operators; and otherwise working with ATMs to ensure transit operations are conducted in an efficient, timely, and cost effective manner. Ex. 1 at 2342[4]. Certain ATMs oversee the performance of relief dispatchers and dispatchers.

Relief dispatchers are full-time bus operators trained to work as dispatchers. Relief dispatchers fill "open" dispatch shifts—i.e., shifts where the regular dispatcher is absent from work or assigned duties separate from the normally assigned shift. Pursuant to Metro Transit policy, a relief dispatcher typically fills open shifts when a regular dispatcher is absent from work for more than one week. Ex. 2.[5] When bus operators work as relief dispatchers, they are taken off their normal shifts as bus operators and instead work at the garage as dispatchers. If a relief dispatcher accepts a dispatch shift, she may also drive a bus on overtime, but is not expected to work both a relief dispatch shift and a bus shift. Affidavit of Ken Benzel ("Benzel Aff."), ¶ 3. Relief dispatchers are

---

[4]   All Exhibits cited herein are attached to the Affidavit of Anna M. Horning Nygren, filed herewith (hereinafter "Ex.")

[5] Metro Transit policies refer to relief dispatchers alternately as "student dispatchers" or "clerks." *See* Exs. 2 and 3. The terms are interchangeable.

not expected to take dispatch shifts when they are on vacation or other leave from their bus operator positions.  Instead, bus operators are only offered dispatch shifts when they are otherwise scheduled to work.  *Id.* at ¶ 4.

While relief dispatchers are not required to take every open dispatch shift offered to them, they are expected to take as many dispatch shifts as they can.  Under Metro Transit policy, relief dispatchers may not "pass," or decline, an open dispatch shift more than two times within a one year period.  Ex. 3.  Under the policy, should a relief dispatcher turn down a shift again after being asked once, she is assigned a second "pass."  *Id.*  Passing on an open shift a third time will result in removal from the relief dispatch roster.  *Id.* [6]  Even if a relief dispatcher accepts an open shift, Metro Transit's standard sick leave policy still applies, and the relief dispatcher is allowed to call in and request time off work if needed just as he could if working as a bus operator.  Benzel Aff., ¶ 6.

### B.    Peterson's Employment With Metro Transit.

Peterson started working at Metro Transit in 1996 as a part-time bus operator.  Peterson Dep. 8:12-13 (Ex. 4).  Peterson became a full-time bus operator in 1998 and a relief dispatcher in 2005.  *Id.* at 8:19; 9:18-22.  In July 2010, Peterson was promoted to

---

[6] The 2011 policy states that a dispatcher may not pass more than two times in a six month period. Ex. 2.  The 2008 policy provides that a dispatcher may not pass more than two times in a year period.  Ex. 3.  The difference between the two policies is immaterial in this case because Peterson passed three times in under six months.

the position of Transit Control Center Supervisor ("TCC Supervisor").[7]  Ex. 4 at 9:1-8; Ex. 5.  Peterson was disqualified as TCC Supervisor in October 2010 because she abandoned her shift and failed to complete the required training.  Ex. 6.  Peterson explained that she walked off her shift and quit her position because she "wasn't comfortable with [her] coworkers."  Ex. 4 at 9:10-13.  Despite leaving during her assigned shift and refusing training in the TCC role, Peterson was allowed to return to her position as a bus operator.  Ex. 6.

Between 2010 and 2014, Peterson applied for a promotion to the position of District Street Supervisor ("DSS") four times.[8]  The hiring process is governed by the Council's Recruitment and Selection Policy.  Ex. 7.  This policy is meant to ensure a fair, open, and consistent hiring process in which "all applicants receive equal opportunity, and that the best candidates are selected for Council employment based on relative ability, knowledge, skills and business need."  *Id.* at 1118.  The application process is overseen by the Council's Human Resources Department with the assistance of a hiring manager and the Council's Office of Equal Opportunity ("OEO").  These individuals work collaboratively to identify the minimum and desired qualifications for all applicants and to develop the application process.  *Id.* at 1119-20.  Subject Matter Experts ("SMEs")

---

[7] TCC Supervisors work out of a central communications center and remotely monitor buses on their routes, take calls from bus operators experiencing problems, and contact bus operators who are not operating on schedule.

[8] District Street Supervisors are mobile supervisors who work out of Metro Transit vehicles and address problems which occur with buses, light rail, and Metro Transit property.  They are also referred to as Transit Supervisors or Street Supervisors.  For clarity, the terms District Street Supervisor or DSS will be used throughout this brief.

—employees within the hiring division who understand the essential knowledge, skills and abilities necessary to succeed in the position—also play a role in the hiring process. SMEs develop assessments designed to identify whether applicants possess the requisite skills, review applicants' qualifications, and participate in the interview and selection process. *Id.* at 1120.

All applications are assessed using standard criteria. Applicants must first undergo a minimum qualifications review to ensure they meet the minimum levels of education and experience required in the job posting. *Id.* Applicants who pass the minimum qualifications review are then advanced through several rounds of additional testing which, depending upon the position, may include: performance tests, written tests, written SME review assessing skills or knowledge of the job area, and oral examinations. *Id.* All assessments are based on a 100 point scale. *Id.* All applicants are given the same test and are scored using the same point system. Affidavit of Marcy Syman, ("Syman Aff."), ¶¶ 3-4. For written tests, all DSS applicants are blindly graded, meaning that no identifying personal information is provided to the scorers. *Id.* at ¶ 5. SME reviews for DSS positions have been blindly graded since 2014. *Id.* at ¶ 6-8. The minimum qualifying scores needed to pass each level of testing is determined prior to starting the selection process. Ex. 7 at 1122. Applicants are scored at each round of testing, and only applicants who score above a predetermined level advance to the next round. *Id.* Seniority does not play a role in the hiring process. Rather, the Council selects "the best qualified candidate based on job related competence (merit principles)." *Id.* at 1121.

In April 2010, Peterson was one of 103 internal applicants for two open DSS positions. Ex. 8. Peterson passed the minimum qualifications review and advanced in the hiring process to a written test assessment. *Id.* She scored 60 out of 100 on her blindly graded written test assessment. *Id.* Because candidates needed a 70 or higher to advance in the hiring process, Peterson did not advance to the next stage. *Id.*

In March 2011, Peterson was one of 87 internal applicants for one open DSS position. Ex. 9. She passed the minimum qualifications review and advanced to the written test assessment with 58 other applicants. *Id.* Scoring 82 out of 100 on her transit knowledge assessment, Peterson was one of 34 candidates who passed the assessment. Ex. 10. Because so many candidates passed the assessment, however, only the 22 candidates who scored an 87 or above advanced to the interview stage. Exs. 10-11. Peterson, who was ranked 29th, did not score high enough to receive an oral interview and was not placed on the final selection list. Exs. 10, 11.

Peterson complained to the OEO, alleging the SME who reviewed her score did not like her, which, she presumed, accounted for her lower application score. Ex. 12. After investigating her complaint, the OEO determined that Peterson's blindly graded written response to a mock customer complaint was inadequate, justifying her lower application score. *Id.* When presented with the OEO's findings, Peterson indicated she was no longer interested in the position. *Id.*

In October 2011, Peterson met with Christy Bailly, Director of Bus Operations; Brian Funk, Assistant Director of Field Operations; Lisa Johnson, Manager of Street Operations; Wanda Kirkpatrick, Director of OEO; and Jan Dietrich, Senior Equal

Opportunity Consultant in the OEO, to discuss how to improve her application scores. Ex. 13.   Peterson was told she had not scored high enough to advance in the hiring process in the testing components because she had not provided enough specificity in her written responses.  *Id*.  All meeting participants encouraged Peterson to continue applying for promotions.  *Id*.

In September 2012, Peterson was one of 59 internal applicants for one DSS position.  Ex. 14.  Peterson did not pass the minimum qualifications review because she did not pass her work record evaluation.  Ex. 15.  Employees lose points under the work record evaluation for attendance and disciplinary issues.  Ex. 16.  Peterson had a violation on her disciplinary record for using a cellular phone while operating a bus.  Exs. 16-17.  Because of the points assessed against Peterson's record for this violation, she did not have sufficient points to advance past the minimum qualifications review.   Peterson admits that nothing about this hiring decision was discriminatory.  Ex. 4 at 24:3-10.

Peterson was one of 75 internal applicants for a DSS position in April 2014.  Exs. 18-19.  She passed the minimum qualifications review, but failed to advance past the blindly graded SME review because of her poor responses to the supplemental questions. Exs. 21-23.  Peterson received only eight points (or a score of 40%) on her supplemental question responses.  Ex. 21.  Applicants needed to score at least 60% to advance to the next stage of the hiring process.  *Id*.  Those applicants who advanced in the hiring process completed a series of additional tests before the final hiring decision was made.

### C.    Peterson's November 2014 Complaint.

On November 7, 2014, Peterson filed a charge with the EEOC alleging discrimination based upon race and gender.[9]  ECF No. 15-1.  Peterson claimed she was unfairly passed over for promotional opportunities in connection with the April 2014 DSS position, alleging the candidate hired had less seniority, experience, and qualifications.  *Id.*

On November 16, 2014, Peterson complained to ATM Ken Benzel that the dispatchers at Heywood Garage were being "mean" to her.  Ex. 24.  Specifically, Peterson claimed that fellow dispatcher T.L. told her that other dispatchers, G.M. and T.R., told him "to be mean to [her]."  Ex. 4 at 60:10-13; 60:20-24.  Garage Manager Doyne Parsons, Mr. Benzel's supervisor, requested the OEO investigate Peterson's concerns. Ex. 25.  An employee from the OEO then met with Peterson but Peterson refused to participate in the investigation.  Exs. 26-28. The OEO nonetheless investigated Peterson's complaint and interviewed Mr. Parsons, Mr. Benzel, and dispatchers T.L. and G.M.  Exs. 26; 29-32.  The dispatchers interviewed denied telling anyone to be mean to Peterson.  Exs. 31-32.  T.L. also denied telling Peterson he was asked to be mean to her. Ex. 31.  On March 18, 2015, the OEO completed its investigation and informed Peterson it had not been able to substantiate any violation of Council policy.  Ex. 33.

### D.    Peterson's Removal From Relief Dispatch.

The week of December 14, 2014, relief dispatchers at Heywood Garage were needed to fill two open dispatch shifts for the upcoming week—December 20-26.  Ex.

---

[9] Peterson has not alleged a gender discrimination claim in her Amended Complaint.

34.   Pursuant to Metro Transit policy, because two shifts involved absences of more than a week, they were offered to relief dispatchers.  Ex. 2 at 2372.  Two relief dispatchers were on rotation at Heywood Garage, Peterson and D.B.  Ex. 34.  D.B. was first in line to take an open dispatch shift; he took one of the open shifts and the other shift was offered to Peterson.  *Id.*  Although Peterson was working in her regular position as bus operator that week and thus available, she declined the relief dispatch shift.  Ex. 4 at 68:8-10; 64:20-21.  A review of the schedule showed that because D.B. had accepted one shift, the second open shift would have placed D.B. into overtime, and relief dispatchers are not forced to work overtime.  Thus, D.B. was not offered the second open shift.  Benzel Aff., ¶ 7.  Because no other relief dispatchers were available to take the open shift, it was offered to Peterson again, and she again declined.  *Id*. at ¶ 8.  A third relief dispatcher had just accepted a new position in a different department, causing that relief dispatcher to be removed from the relief dispatch ranks and no longer able to take open dispatch shifts.  Ex. 35 at 10:16-11:10.

Therefore, on December 17, 2014, Peterson was offered the shift a third time.  Heywood Garage ATM Mary Jo Carrier informed Peterson that if she passed on the shift again, it would be her third pass and she would be permanently removed from the relief dispatch rotation.  Ex. 4 at 71:7-9.  Peterson nonetheless passed on the open dispatch shift, even though she was scheduled and available to work and knew she would be removed from her relief dispatch position.

Mr. Benzel met with Peterson that day, read the section of the policy governing passes by relief dispatchers, and told her she was being removed from the relief dispatch

ranks for passing on a shift three times.  Exs. 36-37.  Peterson then informed Mr. Benzel for the first time that she had told her fellow dispatchers she would not be taking dispatch shifts during the holiday week because her pregnant adult daughter was due around that time and she did not want to be working in the office if she needed to leave on short notice.  Ex. 36.  Peterson admits she never spoke with her supervisors about this request.  *Id.*  Peterson also did not request paid time off, FMLA leave, or sick leave to care for her daughter at this or any other time.  Ex. 4 at 75:3-6; 76:19-21; 77:7-9.

Peterson chose not to grieve her removal from the relief dispatch rotation.  She retained her full-time position as a bus operator and continued to drive a bus out of Heywood Garage.

On July 20, 2015, Peterson filed a second charge alleging her removal from the relief dispatch position was retaliatory for filing her November EEOC 2014 charge.  ECF No. 15-2.  Peterson filed this case on November 5, 2015.

In 2016, Peterson again applied for a DSS position.  After completing the same application process described above, Peterson received a score sufficient to advance in the hiring process, was interviewed and hired as a DSS in August 2016.  Ex. 4 at 10:1-25.  She began working as a DSS on August 13, 2016.  *Id.*

## III.   ARGUMENT

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.

R. Civ. P. 56(a).  Once the moving party has made this showing, the nonmoving party may not rest on the allegations in the pleadings.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  Instead, the nonmoving party by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.  *Id.*  The Supreme Court has instructed that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp.,* 477 U.S. at 327 (citation omitted).

### A.   <u>Peterson's Discrimination Claims Fail.</u>

Peterson has asserted claims of race discrimination under the MHRA, Title VII, Section 1981, and Section 1983,[10] alleging the Council discriminated against her when it failed to promote her to a District Street Supervisor position.  Peterson has no direct evidence of discrimination; therefore, her failure-to-hire claims are analyzed for purposes of each of these statutes under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (Section 1983); *Torgerson v. City of Rochester*, 643

---

[10] A federal action to enforce rights under a Section 1981 claim against a state actor may only be brought pursuant to Section 1983.  *Artis v. Francis Howell N. Band Booster Ass'n, Inc.,* 161 F.3d 1178, 1181 (8th Cir. 1998); *Arradondo v. City of Minneapolis*, No. CIV. 13-2488 RHK, 2015 WL 4727202, at *8 (D. Minn. Aug. 10, 2015).

In Minnesota, a six year statute of limitations period applies to both Section 1981 and Section 1983 claims.  *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 n.3 (8th Cir. 1995); *Woodson*, 974 F. Supp. at 1262.  For the purposes of Peterson's Section 1981 and Section 1983 claims, any conduct prior to November 5, 2009 is time-barred.

F.3d 1031, 1044-45 (8th Cir. 2011) (Title VII and MHRA); *E.E.O.C. v. Con-Way Freight, Inc.*, 622 F.3d 933, 936 (8th Cir. 2010) (Section 1981); *Humphries v. Pulaski Cty. Special Sch. Dist.*, 580 F.3d 688, 697 n.3 (8th Cir. 2009) (applying the same analysis to Title VII and §§ 1981 and 1983 claims which assert parallel, substantially identical, legal theories).

To establish a prima facie case of discrimination in a failure-to-promote context, Peterson must show that: (1) she belongs to a protected class; (2) she applied and was qualified for a job for which the defendant was seeking applicants; (3) she was rejected; and (4) the defendant sought applications from others. *Torgerson*, 643 F.3d at 1046. If Peterson establishes a prima facie case, the burden of production shifts to the Council to rebut the presumption with evidence of a legitimate, nondiscriminatory reason for its decision not to select her for the position. *Id.* If the Council meets that burden, Peterson must provide evidence that the Council's reason was a pretext for intentional discrimination. *Id.*

   1. <u>Even assuming Peterson can establish a prima facie case for failure to promote, the Council has articulated a legitimate nondiscriminatory reason for its hiring decision.</u>

The only position at issue in Peterson's MHRA and Title VII claims is the 2014 District Street Supervisor position.[11]   Consistent with the Council's Recruitment and Selection policy, the position was posted for internal applicants and the hiring process was overseen by Human Resources, a hiring manager, and the OEO. Ex. 7. Of the 75

---

[11] Peterson's 2012, 2011 and 2010 applications are time-barred for the purposes of her Title VII and MHRA claims.   42 U.S.C. § 2000e-5(e)(1); Minn. Stat. § 363A.28; *Woodson*, 974 F. Supp. at 1259.

internal applicants for the position, Peterson, along with 42 other candidates, met the minimum qualifications for the position and advanced to the next stage of the application review—the SME supplement question review. Ex. 22. Candidates answered a series of questions meant to assess their skills and strengths in relationship to the position. All 43 candidates were blindly graded, and 20 candidates scored high enough to advance beyond the SME review. *Id.*

Peterson did not advance past the SME review because her blindly-scored responses, which offered only vague details, received only eight points (40%). Exs. 21-22. Applicants needed to score at least 60% to advance. Ex. 21. Arguably Peterson's low test score precludes her from establishing she was qualified in order to state a prima facie case. *See Allen v. Rumsfeld*, 72 Fed. Appx. 497, 499 (8th Cir. 2003) ("[Plaintiff's] low scores on the skills narrative evaluation preclude her from establishing a prima facie case because they indicate that she was not as qualified as the fifty-six employees who were promoted.").

Even assuming Peterson can establish a prima facie case, however, the Council had a legitimate nondiscriminatory reason for its hiring decision: selecting the candidate who ranked highest in the application process. *See Pierce v. Marsh*, 859 F.2d 601, 603 (8th Cir. 1988). After Peterson was removed from the application process, the remaining candidates completed a performance exam, an oral exam, and an interview. Ex. 22. At each round of assessment, lower scoring candidates were eliminated from the hiring process. Based upon the interviews, one candidate, I.B., a white male, was selected. *Id.* I.B. had worked for Metro Transit for over fourteen years both as a bus operator and a

relief instructor.  He was familiar with Metro Transit policies and had demonstrated success in a supervisory position.  Ex. 38.  I.B. was selected because he consistently performed better than Peterson *and 73 other applicants* during multiple stages of the hiring process—many of those stages based on blind grading.  The Council determined that based upon his test scores and interview, I.B. was the best candidate for the position.

2.     <u>Peterson cannot show the Council's decision was pretext for race discrimination.</u>

Peterson cannot show the Council's proffered reason for hiring I.B. is pretext for discrimination.  Pretext may be established by showing that the employer changed its explanation for why it hired an employee or by the fact that a less qualified employee was hired for the position.  *Torgerson*, 643 F.3d at 1049; *Arraleh v. Cty. of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006).  Pretext does not exist when an employer hires an equally qualified candidate, and it is the employer's role to identify the most qualified candidate.  *Arraleh*, 461 F.3d at 976.  The court will not sit as "'super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers.'"  *Id.* (quoting *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004)).

To show she was more qualified than I.B., Peterson rests solely upon her assertions that she had "been there longer than him" and "they hired someone, a male, who had less qualifications than [she did]." Ex. 4 at 20:1-5; 20:10-18, 23-25.  Peterson's subjective belief that she was more qualified than I.B. does not establish pretext. Contrary to Peterson's assertion, seniority is not a factor in hiring.  Rather, the Council's application process focuses on merit and hiring the *best* candidate, regardless of seniority.

Ex. 7; Syman Aff. ¶ 9.  As discussed above, I.B.'s higher application score in addition to his experience and demonstrated success in a supervisory position made him the best candidate for the position.

Nor can Peterson establish pretext by her bald assertion that "management" did not want her in a supervisory position.  Peterson cannot rely on "mere allegations and suppositions in opposing the Motion for Summary Judgment, but must come forward with evidence creating a genuine issue of material fact." *Pearson v. Indep. Sch. Dist. No. 2142*, No. 00-779 PAM/JGL, 2001 WL 1640071, at *6 (D. Minn. Aug. 22, 2001).  Peterson alleges she was told by different, mostly non-managerial employees that "management" made statements in 2009 about not wanting her in a supervisory role and that in 2011 the Director of OEO, Wanda Kirkpatrick, an African American, said she was "not wanted" in management.  Ex. 39; Ex. 4 at 41:7-20.

Peterson's allegations are largely comprised of second- and third-hand hearsay statements about what "management" supposedly thought about her.  Many of these alleged statements were supposedly made to Peterson in 2015 referring to alleged comments from 2009 – six years earlier.  *See* Ex. 4 at 48:14-49:6; 43:17-44:14; Ex. 39.  Not only may inadmissible hearsay not be used to support a motion for summary judgment, *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008), but Peterson acknowledged the limited reliability of her allegations.  *See* Ex. 4 at 49:3-6 (stating "I don't know if anybody said it to [P.W.].  I don't know" when asked to explain a comment she relied upon for her allegations about management).

But even assuming for the purposes of this motion that Peterson's allegations, however stale, are admissible and true, Peterson offered no evidence to support her claim that she was "not wanted" in management ***based upon her race***.  *See* Ex. 4 at 36:2-8; 49:10-24 ("I don't know why, but I feel that way. . . . Because I wasn't in management.  I never got into management, the position that I wanted.")   Nor has she offered any evidence that the individuals to whom such statements were attributed were even involved in the hiring process.  Instead, when asked what facts she had to support her claim of race discrimination, Peterson admitted:  "I don't have any facts.  I just believe that." *Id*. at 50:15-18.  Such vague, unsupported allegations are insufficient as a matter of law to create an issue of material fact.   Especially here, given that Peterson was eliminated from the hiring process ***based on the blind scoring of her application***, unsupported allegations of bias can have no possible bearing on the Council's hiring decision.

3. <u>Peterson's Section 1981 and 1983 failure to promote claims fail as a matter of law.</u>

To the extent Peterson intends to allege discriminatory failure to promote under Sections 1981 and 1983 with respect to the DSS positions she sought in 2012, 2011, and 2010, these claims fail for the same reason asserted above: Peterson was not hired for the nondiscriminatory reason that she did not receive sufficient scores during the blind application process to advance to the interview stage.

With respect to her 2012 DSS application, Peterson failed her work record evaluation because she had been disciplined for a cell phone violation.[12]  Ex. 17.  Based upon this violation, she lacked sufficient points on her work record and thus did not meet the minimum qualifications to be considered for the position.  Ex. 16.  When the minimum qualifications for a job posting are not met, a prima facie case cannot be established.  *See Con-Way*, 622 F.3d at 938; *Pearson*, 2001 WL 1640071, at *4.  In addition, Peterson conceded in her deposition that the 2012 denial was not discriminatory based on her race.  Ex. 4 at 24:3-10.

Even if Peterson can establish a prima facie case as to her 2011 and 2010 DSS applications, the Council has articulated legitimate nondiscriminatory reasons for its hiring decisions.  While Peterson advanced to the written test stage of the hiring process in 2011, she did not receive a sufficient score on her blindly graded test to advance to the interview stage.  Ex. 11; Ex. 9.[13]  In 2010, Peterson again passed the minimum qualification review, but scored only 60% on her blindly graded written test.  Ex. 8.

---

[12] Peterson acknowledges there was nothing discriminatory about the cell phone violation which lead to her exclusion from consideration in the 2012 hiring process.  Ex. 4 at 23:22-24:10; 39:10-12.

[13] When Peterson complained about the hiring process to OEO in 2011, she did not assert that she was not hired for discriminatory reasons.  Rather, Peterson alleged that she was not hired because one of the testers did not "like her."  Ex. 12.  The OEO investigated her complaint and determined the reviewer did not know Peterson's identity when reviewing her test, and Peterson did not provide adequate answers in response to questions, justifying her low score.  *Id.*  When Peterson later claimed she was not hired because Lisa Johnson and Christy Bailly did not "like her," OEO investigated and again determined that Peterson was not hired because she did not score high enough on her written questions to advance in the hiring process.  Ex. 13.

Because only candidates with a score of 70% or higher moved to the next stage of review, Peterson did not advance in the hiring process.  *Id.*

In both cases the Council determined the candidates it hired were better qualified based upon the standard application process which emphasized *merit* selection. Peterson's allegations that management "did not want her" in a supervisory position fail to create a fact issue regarding pretext.  The majority of the statements Peterson relies on as evidence of improper motive were not only hearsay, but occurred in 2009, before she was *promoted* to the position of TCC Supervisor in 2010—belying the very comments she asserts.  As discussed above, Peterson offered no evidence to support her claims other than her own belief that the hiring decisions must be discriminatory.  Peterson's claims under Section 1981 and 1983 must be dismissed.

### B.        Peterson's Retaliation Claim Under The MHRA Fails.

To establish a prima facie claim of retaliation under the MHRA, a plaintiff must show: (1) she engaged in a statutorily protected activity; (2) the employer took action against her that a reasonable person would find to be materially adverse; and (3) the adverse action is causally linked to her participation in the protected activity.  *Black v. Indep. Sch. Dist. No. 316*, 476 F. Supp. 2d 1115, 1121 (D. Minn. 2007).  If the employer can show a legitimate, non-retaliatory reason for its actions, the burden returns to the employee to present evidence the employer's stated reason was pretextual.  *Id.*

Peterson claims that in retaliation for filing a charge with the EEOC in November 2014, she was removed from her position of relief dispatcher.  Am. Cmpl. ¶ 12 (ECF No. 15).  Peterson also claims she was subjected to various retaliatory actions such as

increased monitoring of her driving, denial of overtime, other dispatchers being "mean" to her, and being criticized for her demeanor.  Ex. 4 at 107:1-109:21.  As explained below, Metro Transit had a legitimate, non-retaliatory reason for removing Peterson from the relief dispatcher rotation and her other allegations of various slights do not rise to the level of an adverse employment action.

1.      Peterson's alleged retaliatory treatment does not rise to actionable adverse employment action.

Peterson claims that after she filed her EEOC charge in November 2014 "everything started happening."  Ex. 4 at 83:7-25; 102:16-22.  Peterson's allegations, whether viewed alone or together, do not rise to an adverse employment action.  To be actionable, a reasonable employee must find the action materially adverse.  *Black*, 476 F. Supp. 2d at 1121.  "'[N]ot everything that makes an employee unhappy is an actionable adverse action.'"  *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 932 (8th Cir. 2011) (quoting *Devin v. Schwan's Home Serv., Inc.,* 491 F.3d 778, 789 (8th Cir. 2007), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)).

With respect to the alleged increased monitoring, Peterson claims that her manager, Linda Bechtold, reviewed videotape of her driving for eight hours in response to a customer complaint.  Ex. 4 at 107:12-22.  But Peterson admits this incident of monitoring occurred in 2012 – not after she filed her charge in November 2014.  *Id.* Peterson could not recall any other incidents of increased monitoring of her driving.  *Id.* at 108:2-6.

With respect to the allegation that she was unfairly criticized for her demeanor, on November 10, 2014, Garage Manager Doyne Parsons spoke with Peterson because she had not contacted bus operators in order to fill open operator shifts, forcing Heywood Garage to cancel certain bus routes because there were not enough drivers. Ex. 40. Parsons had a similar conversation with Peterson the next day about the proper method for contacting bus operators to fill open work. Ex. 41. As a relief dispatcher, Peterson was tasked with ensuring proper coverage for routes. Ex. 1. Because she failed to do so, Metro Transit had to cancel certain bus runs. Ex. 41. Peterson testified that Parsons simply asked her if she had properly followed policies. When asked if she followed those policies, she admitted she had followed some but "not all of them." Ex. 4 at 109:6-12. The record is undisputed that neither conversation with Parsons resulted in any disciplinary action for Peterson. Not only were the conversations legitimate based on Peterson's admitted conduct in not following all policies, but they were not disciplinary and did not rise to an adverse employment action.

Similarly, Peterson's allegations about not receiving or being paid overtime do not support her retaliation claim. One of the instances she cites, not receiving overtime because it was given to another employee, appears to have occurred in 2013 *before* her EEOC complaint, and Peterson was paid for that overtime. Exs. 42-43. Even if the loss of overtime occurred in January 2015, Peterson acknowledged she was paid for the overtime as soon as she complained and can show no causal connection between an error in her pay and her complaint. Ex. 4 at 87:9-12. The same goes for Peterson's claim that she was not paid for 28 hours of overtime. Peterson offered no evidence suggesting this

overtime was deliberately withheld from her paycheck other than her belief that she "just felt" the removal of hours was discriminatory and retaliatory. *Id.* at 92:23-94:7. But as soon as she brought the omission to her supervisor's attention, her overtime was paid. *Id.*

Finally, Peterson maintains that dispatcher T.L. said other dispatchers told him to "be mean" to her. *Id.* at 60:5-13; 77:15-20. T.L. denies that this happened, and the OEO investigated this complaint and could not substantiate it. Exs. 31, 33. Even assuming the truth of this allegation, this isolated comment by a co-worker is nothing more than a petty slight that is not actionable.

The issues relied upon by Peterson to support a retaliation claim either did not occur in any proximity to her protected conduct, defeating any causal connection, or amount to nothing more than "petty slights, minor annoyances, and simple lack of good manners"; such acts will not dissuade a reasonable person from pursuing a claim of retaliation. *Black*, 476 F. Supp. 2d at 1121; *accord Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008); *Arraleh*, 461 F.3d at 979 (stating "teasing, offhand comments and isolated incidents (unless extremely serious)" do not amount to discriminatory changes in the terms and conditions of employment). Peterson's retaliation claim based on these general allegations of "monitoring" and "targeting" must be dismissed.

        2.      <u>Metro Transit had a legitimate nondiscriminatory reason to remove Peterson from her relief dispatch position</u>

The only conduct cited by Peterson that even arguably amounts to an adverse employment action is her removal from her relief dispatch position. This claim fails

because the Council had a legitimate, nondiscriminatory reason for removing Peterson from the dispatch rotation.  Peterson was removed from the relief dispatch ranks pursuant to a Metro Transit policy providing that relief dispatchers could be disqualified from their position if they turn down or pass on open work three times.  Engaging in protected conduct does not insulate an employee from discipline.  *Arraleh*, 461 F.3d at 977-78.  Indeed, an employer's belief that the employee violated a company policy is a legitimate non-retaliatory reason for the employer's action.  *Chivers*, 641 F.3d at 934 (citing *Richey v. City of Independence,* 540 F.3d 779, 784 (8th Cir. 2008)).

Under Metro Transit policy, if a relief dispatcher turns down an open shift after all other relief dispatchers have been asked once, the relief dispatcher is assessed a pass.  Ex. 3.  According to policy, if "all relief dispatchers turn down the shift a second time, they will receive another 'pass.'  A third offering and decline of an available shift will result in disqualification as a relief dispatcher.  Three passes within a rolling calendar year disqualifies you as a relief dispatcher and removes you from the relief dispatcher roster."  *Id.*  On December 17, 2014, two dispatch shifts needed filling; D.B. took one open dispatch shift and Peterson was offered the second.  Ex. 2 at 2372.  Peterson declined although she was working her full-time schedule as a bus operator that week and was thus considered available to take an open relief dispatch shifts.  Ex. 4 at 68:4-9; Benzel Aff., ¶ 7.  After determining that there was no other relief dispatcher at Heywood to take the shift, it was offered to Peterson two additional times.  *See* Ex. 2.  Peterson passed each time.  Before Peterson turned down the shift a third time, she was informed that

passing would result in her removal from relief dispatch.  Ex. 35 at 69:8-18. Nonetheless, Peterson passed a third time.

Although Peterson claims she wanted to be available in case her daughter had her baby that week, she was scheduled to work as a bus operator that week.  Peterson admittedly had not requested time off for the week, which would have removed her from the relief dispatcher list at the outset.  Instead, she was working as a full-time bus operator for the week and was thus available to work the dispatch shift.  Nothing would have prevented Peterson from seeking leave under Metro Transit policies even after accepting the dispatch shift.  In other words, she could have called in sick whether she was working as a bus operator or had accepted the open dispatch shift.  Benzel Aff., ¶ 11. Instead, Peterson declined the shift despite being scheduled to work during the same time she was needed to cover the open shift.

The policy specifically contemplates charging employees with a "pass" if they turn down a request to take a shift three times.  Having not requested any vacation or leave which would have excused her from taking the relief dispatch shift, Peterson was removed from relief dispatch.  Benzel Aff., ¶ 10.  Metro Transit's decision to remove her from the relief dispatch rotation in full compliance with Metro Transit policy is a legitimate non-discriminatory reason for the action.

        3.       <u>Peterson cannot show her removal from relief dispatch was pretext for retaliation based on her EEOC charge.</u>

Further, Peterson cannot establish that her removal from relief dispatch was pretext for retaliation.  Temporal proximity to protected conduct alone is generally

insufficient to prove pretext. *Arraleh*, 461 F.3d at 978. Therefore, to establish pretext Peterson must do more than simply allege she was removed from her relief dispatch position shortly after filing a charge with the EEOC.

To the extent Peterson argues her removal from relief dispatch was pretext because the relief dispatch policy could have been applied differently, her argument fails. Courts are reluctant to interpret the appropriateness of an employer's policy or an employer's exercise of business judgment. *See Chivers*, 641 F.3d at 934 ("[Plaintiff's] argument requires us to interpret an employer's policy, however, which we are generally reluctant to do.'") (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 883 (8th Cir. 2005)); *Richey*, 540 F.3d at 786 ("It is generally for an employer to interpret its own policies. . . . Even if the City has misapplied its own policy, moreover, that alone does not constitute evidence of discrimination. The City, like any employer, 'can choose how to run its business, including not to follow its own personnel policies regarding termination of an employee . . . , as long as it does not unlawfully discriminate in doing so.'") (quoting *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1036 (8th Cir. 2005) *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)). Under these circumstances, where Metro Transit acted entirely consistent with a written policy, Peterson must show that Metro Transit applied its policy arbitrarily or inconsistently or that other similarly situated individuals were treated differently to establish pretext. *See Richey*, 540 F.3d at 786.

Peterson offers no evidence that the Council has applied this policy inconsistently under the same or similar circumstances. When asked why she felt she was retaliated

against, Peterson's only explanation was "[b]ecause I'm an African-American female. Never had a problem in dispatch.  Never.  Passed up shifts before and nothing has ever happened."  Ex. 4 at 71:14-20.  But there is no evidence that Peterson passed on a shift request three times when no other relief dispatcher was available, or that she passed on a shift when she was scheduled to work and thus available.  She offered no facts to support her claim that she was removed from her relief dispatch position in retaliation for her complaint.  *Id*. at 72:10-14.

Not only can Peterson offer no evidence of an *inconsistent* application of this policy, Metro Transit can offer affirmative evidence that it has applied the policy to remove two relief dispatchers from the relief dispatcher rotation under similar circumstances.  In 2008 or 2009, relief dispatcher J.C., a white male, was permanently removed from his relief dispatch position at South Garage after he passed on the same dispatch shift three times.  Ex. 44.  Similarly, in July 2016, Heywood Garage relief dispatcher B.C., also a white male, was permanently removed from his relief dispatch position after he passed on the same shift three times.  *Id*.  Because Peterson offered no evidence that the three pass policy has been applied inconsistently and because similarly situated employees have also been removed for violating the policy, Peterson cannot establish an issue of fact as to pretext and her retaliation claim fails.  *Chivers*, 641 F.3d at 935.

### C.   Peterson's FMLA Interference And Retaliation Claims Fail.

Peterson asserts two claims under the Family and Medical Leave Act: first that the Council interfered with her right to take qualifying leave to care for her pregnant adult

daughter and second, that the Council retaliated against her for requesting that leave. Peterson's FMLA claims are premised on her refusal to work a relief dispatch shift the week of Christmas because her daughter, S.G., was "due around that time" and she wanted to be available to take her to the hospital when she went into labor.  *See* Ex. 36; Ex. 4 at 71:4-5; 66:22-23.  Even taken in a light most favorable to Peterson, neither claim can survive summary judgment.

<blockquote>1.      Peterson's FMLA interference claim fails because she neither requested leave nor provided sufficient notice of her need for leave.</blockquote>

The FMLA prohibits employers from interfering with, restraining, or denying the exercise of an employee's rights provided under the Act.  *See* 29 U.S.C. § 2615(a)(1).  To assert an interference claim under the FMLA, the plaintiff must show that she gave her employer adequate and timely notice of her need for leave.  *Chappell v. Bilco Co.*, 675 F.3d 1110, 1116 (8th Cir. 2012) (citing *Rynders v. Williams,* 650 F.3d 1188, 1196 (8th Cir. 2011)).  The FMLA requires an employee to provide thirty days' advance notice of leave when the leave is foreseeable, but if thirty days' notice is not practicable because of a lack of knowledge of approximately when the leave will be required to begin, notice must be given as soon as practicable.  29 C.F.R. § 825.302(a).  An employee does not need to mention the FMLA by name, but she must provide information sufficient to tell her employer the reason for seeking leave relates to a health condition that could be serious.  *Chappell*, 675 F.3d at 1116 (stating adequate notice requires "enough information to put the employer on notice that the employee may need FMLA leave"); *Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 786 (8th Cir. 2009).

Peterson's interference claim fails because, as she testified in her deposition, she never requested qualifying leave.  A claim for FMLA interference cannot succeed unless the employee can show that she gave her employer adequate and timely notice of her need for leave.  *Rynders*, 650 F.3d at 1196.  The Council's FMLA policy requires employees to either complete a Request for Leave form and provide it to their manager thirty days prior to the start of their leave, or if the leave is not anticipated, to complete the Request for Leave form and notify management *as soon as possible* of the intent to take leave.  Ex. 45 at 3.

Peterson has taken intermittent FMLA leave and admits she is familiar with the process for requesting FMLA leave.  Exs. 20, 46; Ex. 4 at 75:14-76:-15.  Despite knowing the process, Peterson did not request medical leave.  Ex. 4 at 75:3-6; 76:19-21 ("Q: Did you request medical leave to care for your daughter in December of 2014? A: No, I did not.").  To the contrary, Peterson was scheduled to work her regular bus shift and never requested time off.  *Id*. at 68:8-9 ("Q:  Did you request this week off as a bus operator? A: No.  I was in the office that week.").

In light of this claim-dispositive admission, Peterson attempts to rely on her assertion that she told her managers and other dispatchers in August 2014 they needed to "hire more" relief dispatchers because her daughter was due at the end of the year and she knew other dispatchers would want to take time off.  *Id*. at 67:7-69:1.  Yet, Peterson has admitted that this statement about needing more dispatchers was not a request for time off.  *Id*. at 68:22-23.

When Peterson declined the open dispatch shift in December 2014, she told Ms. Carrier that she could not take the shift "because my daughter's due around that time." *Id.* at 71:3-5. She made a similar statement to Mr. Benzel when she was removed from relief dispatch. Ex. 36. To the extent Peterson made any statements to other dispatchers or management about her daughter's health, it was only that her daughter was "due soon." *See* Ex. 47 at 136:2-4; Ex. 48 at 46:13-47:4.

This information—that her daughter was having her baby soon—did not provide the Council sufficient notice of a request for FMLA leave. *See Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1384-85 (11th Cir. 2005) (holding that statement by plaintiff that her daughter was in labor was insufficient to provide her employer with notice that her daughter was experiencing "anything other than a normal pregnancy" that would qualify her for FMLA leave); *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 952 (7th Cir. 2004) (holding that requesting leave to "stay home with his wife until she gave birth" without giving complications, false labor or a serious health condition as a reason for the leave request as insufficient to satisfy the FMLA's notice requirement).

Significantly, and fatal to any effort by Peterson to create a fact issue on this claim, is the crucial fact that Peterson ***was scheduled to work her bus operator shift the same week*** and does not dispute that she never requested FMLA or any other type of leave ***from work*** on the basis that her daughter was "due soon." Instead, she brings this claim over the fact that she did not want to accept a particular shift as a relief dispatcher during a week in which she was otherwise scheduled to work. Because Peterson

admittedly never requested FMLA leave or sought to avail herself of the protections of the FMLA, she cannot state a claim for interference under the statute.

2.     Peterson's FMLA Retaliation Claim Fails.

Peterson similarly cannot establish a claim of retaliation for requesting or taking FMLA leave.  To establish a retaliation claim, Peterson must show: (1) that she exercised the rights afforded to her by the FMLA; (2) that she suffered an adverse employment action; and (3) a causal connection between the two.  *Chappell*, 675 F.3d at 1116–17. Absent direct evidence of retaliation, a FMLA retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting framework.   *Id.*; *Wierman v. Casey's General Stores,* 638 F.3d 984, 999 (8th Cir. 2011) (citing *Phillips v. Matthews,* 547 F.3d 905, 912 (8th Cir. 2008)).   If Peterson establishes a prima facie case, the burden shifts to the Council to provide a non-discriminatory, legitimate justification for its conduct.  If such a showing is made, Peterson must "'either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination.'"  *Chappell*, 675 F.3d at 1116–17 (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)).

Here, Peterson cannot establish a prima facie case because she did not exercise her FMLA rights.  *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1017 (8th Cir. 2013) ("However, because [Plaintiff] failed to plead notice of intent to take FMLA leave, and that she was qualified for that leave, she has not sufficiently alleged that she exercised FMLA right.").  As discussed above, Peterson did not request FMLA leave and did not provide the Council with notice of any serious health condition which would qualify for

FMLA leave. Because Peterson did not exercise any rights provided to her by the FMLA, she cannot assert an FMLA retaliation claim and her claim should be dismissed.

### D. Peterson's Interference And Retaliation Claims Under State Law Similarly Fail.

Peterson claims interference with and retaliation for exercising her leave rights under Minn. Stat. § 181.9413. As with her FMLA claims, Peterson's state law leave claims fail because she did not request sick leave to care for her daughter. *Cf. Skaff v. Fairview Health Servs.*, No. CIV. 12-312 ADM/SER, 2012 WL 1466775, at *2 (D. Minn. Apr. 27, 2012) ("[Plaintiff] fails to state a claim under Minn. Stat. § 181.9413(a) because she seeks to have her [unapproved] absences [for which corrective notices were issued] approved rather than credited as personal sick leave. . . . The corrective action notices, however, cannot form the basis of a SICCLA claim because they related to approval of leave, not the use of sick leave benefits."). Peterson's interference and retaliation claims are premised on her refusal to accept an open dispatch shift in December 2014. But as discussed above, Peterson did not request sick leave when she declined the dispatch shift. Ex. 4 at 76:19-21. Indeed, although she declined a dispatch shift, she did not seek time off from her position as a bus operator. Absent a request for leave, Peterson cannot establish a claim either for interference or retaliation under Minn. Stat. § 181.9413 and these claims must be dismissed.

### IV. CONCLUSION

Because Peterson can create no issue of fact precluding summary judgment on her race discrimination claims, her retaliation claims, or her state and federal leave act

claims, the Metropolitan Council respectfully requests the Court grant summary judgment on all counts and dismiss Peterson's Amended Complaint in its entirety with prejudice.

Dated:  November 7, 2016       Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/Anna M. Horning Nygren
Susan E. Ellingstad (#243346)
Anna M. Horning Nygren (#386514)
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981
seellingstad@locklaw.com
amhorningnygren@locklaw.com

Sydnee N. Woods (#0275384)
Associate General Counsel
Metropolitan Council
390 Robert Street North
St. Paul, MN 55101
Tel:    (651) 602-1410
Fax:    (651) 602-1640
sydnee.woods@metc.state.mn.us

**ATTORNEYS FOR DEFENDANT**
**METROPOLITAN COUNCIL**